# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CR. NO. 15-32-JWD-EWD |
| VERSUS | JUDGE JOHN W. deGRAVELLES |
| OSCAR ARTURO MACHADO-GALEANA, ET AL. | |

## RULING AND ORDER

### I. INTRODUCTION

This matter is before the Court on a Motion to Reconsider the Suppression of the Title III Wiretap filed by Defendant Roy Martin Herrera Romero. ("Motion," Doc. 490). The Government has filed an Opposition. (Doc. 514).

After careful consideration of the law, the facts of this case, and the parties' arguments, for the reasons set forth below, the Motion is denied.

### II. FACTUAL BACKGROUND

In December 2014, this Court authorized and later re-authorized the wiretap of a telephone line used by Defendant Oscar Machado-Galeana. (*See generally* Docs. 490-3, 490-4). An affidavit in support of the wiretap stated that the wiretap would likely reveal evidence concerning a drug trafficking conspiracy; the identities of the targets' associates and the conspiracy's personnel; the identities of individuals supplying drugs and financing and receiving proceeds from drug trafficking; the participants' roles in the conspiracy; the nature, scope, places, and methods of operation of the conspiracy; and the full nature and identity of the enterprise. (Doc. 514-1 at 23, 44). The affidavit discussed the alleged conspiracy, noting that its members likely had ties to a Mexican cartel and a supplier in California. (*Id.* at 25, 30, 64).

1

The orders authorizing the wiretap stated, *inter alia*, that interceptions should be conducted "as to minimize the interception of wire and electronic communications not otherwise subject to interception" and that monitoring would terminate "immediately when it is determined the conversation is unrelated to communications subject to interception[.]" (Doc. 490-3 at 4; Doc. 490-4 at 4). The orders continued:

> Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the **TARGET SUBJECTS** [including Machado-Galeana, Romero, and others] or any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. If a conversation has been minimized, the monitoring agents will spot check to ensure that the conversation has not turned to criminal matters. Each text message will be reviewed over a secure system, and based upon the identities of the sender and the recipient and the content of the message, monitoring personnel will determine as soon as practicable after the interception whether the text message appears to be relevant to the investigation or otherwise criminal in nature. If the message is not criminal in nature, the message will be marked "SMS Non-pertinent" and not accessed by other members of the investigative team. If the message appears to be privileged, it will be marked "Privileged" and secured from access from other members of the investigative team. If a text message appears to be relevant to the investigation or otherwise criminal in nature, it will be marked "SMS-Pertinent" and may be shared with other agents or monitors involved in the investigation. If a text message is marked "SMS Non-Pertinent" or "Privileged," it will not be disseminated to members of the investigative team. All intercepted text messages will be sealed with the Court upon expiration of the Court's Order authorizing the interception. It is anticipated that the monitoring location will not be staffed at all times, but will be staffed at regular hours, at which time intercepted communication will be monitored and read (including those intercepted at hours when the location was not staffed). However, even when unmanned, the monitoring location will be kept secured with access limited only to authorized monitoring personnel and their supervising agents[.]
>
> IT IS FURTHER ORDERED that . . . in the event the intercepted wire or electronic communications are in code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception[.]

(Doc. 490-3 at 5-6; Doc. 490-4 at 4-6 (formatting altered)).

The United States Attorney's Office prepared instructions for conducting the wiretap. (*See generally* Doc. 490-9). The instructions stated that the interception of non-pertinent and privileged communications should be minimized, that the results of the wiretap could be suppressed if monitors "listen[ed] to every communication occurring over the designated telephone lines," and that "'[m]inimization' requires that the agents and officers make a good faith determination of whether each communication is relevant to those illegal activities described [below]." (*Id.* at 2). The instructions directed that, if, "after several days or weeks of interception, we have learned that communications between one or more of the **TARGET SUBJECTS** and a particular individual or individuals are invariably innocent, non-crime related matters, then a 'pattern of innocence' exists and such communications should not be recorded, listened to, or even spot monitored, once such an individual has been identified as a party to the communication." (*Id.* at 9). On the other hand, the instructions stated that, "[i]f we have been able to identify (by visual surveillance, name, nickname, voice, etc.), one or more individuals as co-conspirators, confederates, accomplices, or agents of one of our subjects in his or her Illegal Activities, and there is no applicable privilege involved . . . the 'spot monitoring' requirement may be relaxed somewhat as to communications between our **TARGET SUBJECTS** and those individuals." (*Id.* at 9-10).

While the wiretap was operating, four 15-Day Reports issued to a judge of this Court concerning the operation of the wiretap. (*See generally* Docs. 490-5, 490-6, 490-7, 490-8). Each of these reports stated that DEA monitors listened to all intercepted communications in real time and determined "when, or if, a conversation should be intercepted or minimized," and monitors "made efforts to, and did, minimize non-pertinent conversations." (Doc. 490-5 at 1; Doc. 490-6 at 1; Doc. 490-7 at 1-2; Doc. 490-8 at 1).

Each 15-Day Report also contained statistics concerning the operation of the wiretap during that period. The first 15-Day Report stated that 712 calls had been intercepted, 141 of those had been deemed "pertinent," and 13 had been minimized. (Doc. 490-5 at 18). 86 of the total calls were longer than 2 minutes, and 11 calls longer than 2 minutes were minimized. (*Id.*).

The second 15-Day Report stated that 578 calls had been intercepted, 109 of those had been deemed "pertinent," and 10 had been minimized. (Doc. 490-6 at 14). 84 of the calls were longer than 2 minutes, and 3 calls longer than 2 minutes were minimized. (*Id.*).

The third 15-Day Report stated that 581 calls had been intercepted, 158 of those had been deemed "pertinent," and 5 had been minimized. (Doc. 490-7 at 19). 97 of the calls were longer than 2 minutes, and 4 calls longer than 2 minutes were minimized. (*Id.*).

The fourth 15-Day Report stated that 607 calls had been intercepted, 132 of those had been deemed "pertinent," and 14 had been minimized. (Doc. 490-8 at 24). 70 of the calls were longer than 2 minutes, and 4 calls longer than 2 minutes were minimized. (*Id.*).

According to a list of definitions attached to each 15-Day Report, calls longer than 2 minutes "offered an opportunity to minimize." (Doc. 490-5 at 16; Doc. 490-6 at 17; Doc. 490-7 at 22; Doc. 490-8 at 27).

On February 16, 2018 the Court held a hearing to authenticate the communications intercepted by the wiretap. (Doc. 486 at 1-2). During the hearing, Maria Reyes, a wiretap monitor, testified that she was present "100 percent of the time when [subjects of the wiretap] were speaking originally" and she was responsible for listening to "every call that came in" during her shift in its entirety. (Doc. 536 at 60-61, 64). Similarly, Ricardo Robles, another wiretap monitor, testified that he "intercepted all of [his] calls through [his] eight hour shift" and that he "ha[d] to do a synopsis of every call." (*Id.* at 92-93).

## III. DISCUSSION

### a. Standard

18 U.S.C. section 2518(5) states that an order authorizing a wiretap must include a provision that the wiretap "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception[,]" and 18 U.S.C. section 2518(10) permits a defendant to seek suppression of the contents of "any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom," on the grounds that the interception was intercepted unlawfully or not "in conformity with the order of authorization or approval."

The Fifth Circuit has set forth the following standards concerning minimization of calls during a wiretap:

> Federal law requires electronic surveillance to be conducted in such a way as to minimize the interception of communications not otherwise subject to interception. The government's efforts to minimize interception of non-pertinent conversations must be objectively reasonable in light of the circumstances confronting the interceptor. This court has set forth a three-part test to determine whether the government's minimization efforts meet this standard: (1) the nature and scope of the criminal enterprise under investigation; (2) the Government's reasonable inferences of the character of a conversation from the parties to it; and (3) the extent of judicial supervision.
>
> Although 18 U.S.C. § 2515 requires minimization, it does not require government agents to avoid intercepting all nonrelevant conversations when conducting a wiretap investigation. On the contrary, the practical necessities of conducting a wiretap may, in some circumstances, inevitably lead to the interception of some conversations outside the scope of the wiretap order: The only feasible approach to minimization is the gradual development, during the execution of a particular wiretap order, of categories of calls which most likely will not produce information relevant to the investigation. Until such categories become reasonably apparent, however, interception of all calls will be justified under the wiretap authorization.
>
> Accordingly, the government may reasonably intercept more calls during the initial phase of an investigation, when the precise scope of and participants in the criminal scheme have not yet been identified. This consideration is especially strong where the criminal enterprise under investigation is a large and

sophisticated conspiracy, and the purpose of the intercept order is to learn the identities of conspirators and define the reach of the conspiracy.

*United States v. Brown*, 303 F.3d 582, 604–05 (5th Cir. 2002) (citations and internal quotation marks omitted, formatting altered); *see also United States v. Cleveland*, 964 F.Supp. 1073, 1093 (E.D. La. 1997) (Vance, J.) (listing factors that courts consider in evaluating the reasonableness of minimization efforts, including the focus and scope of the investigation, the types of calls being received, the thoroughness of the Government's efforts toward minimization, the degree of judicial supervision over the wiretap, and the timing of the intercepted conversations during the investigation). Generally, the Government bears the initial burden of demonstrating that it complied with the minimization requirement; if that prima facie showing is made, the burden then shifts to the defendant to show why efforts at minimization were inadequate. *See Cleveland*, 964 F.Supp. at 1092.

*Brown* and *Cleveland* both relied upon and cited the Supreme Court's decision in *Scott v. United States*, 436 U.S. 128 (1978). *Scott* discussed minimization efforts in the following excerpt:

> We agree with the Court of Appeals that blind reliance on the percentage of nonpertinent calls intercepted is not a sure guide to the correct answer. Such percentages may provide assistance, but there are surely cases, such as the one at bar, where the percentage of nonpertinent calls is relatively high and yet their interception was still reasonable. The reasons for this may be many. Many of the nonpertinent calls may have been very short. Others may have been one-time only calls. Still other calls may have been ambiguous in nature or apparently involved guarded or coded language. In all these circumstances agents can hardly be expected to know that the calls are not pertinent prior to their termination.
>
> In determining whether the agents properly minimized, it is also important to consider the circumstances of the wiretap. For example, when the investigation is focusing on what is thought to be a widespread conspiracy more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise. And it is possible that many more of the conversations will be permissibly interceptible because they will involve one or more of the co-conspirators. The type of use to which the telephone is normally put may also

> have some bearing on the extent of minimization required. For example, if the agents are permitted to tap a public telephone because one individual is thought to be placing bets over the phone, substantial doubts as to minimization may arise if the agents listen to every call which goes out over that phone regardless of who places the call. On the other hand, if the phone is located in the residence of a person who is thought to be the head of a major drug ring, a contrary conclusion may be indicated.
>
> Other factors may also play a significant part in a particular case. For example, it may be important to determine at exactly what point during the authorized period the interception was made. During the early stages of surveillance the agents may be forced to intercept all calls to establish categories of nonpertinent calls which will not be intercepted thereafter. Interception of those same types of calls might be unreasonable later on, however, once the nonpertinent categories have been established and it is clear that this particular conversation is of that type. Other situations may arise where patterns of nonpertinent calls do not appear. In these circumstances it may not be unreasonable to intercept almost every short conversation because the determination of relevancy cannot be made before the call is completed.

*Scott*, 436 U.S. at 140–41.

"Following *Scott,* some courts have held that calls of less than 2 minutes do not require minimization." *United States v. Dumes*, 313 F.3d 372, 380 (7th Cir. 2002) (citing and agreeing with *United States v. Malekzadeh,* 855 F.2d 1492 (11th Cir. 1988); *United States v. Apodaca,* 820 F.2d 348 (10th Cir. 1987)). Some courts have also ruled that extra "leeway" is warranted where targets use "codes and specialized jargon," and that "[t]he use of a foreign language itself supplies an extra layer of complexity." *United States v. Gordon*, 871 F.3d 35, 48 (1st Cir. 2017) (citation omitted); *see also United States v. Adams*, 759 F.2d 1099, 1115 (3d Cir. 1985) (minimization efforts reasonable where "[t]he conspiracy not only involved a large number of individuals, but the participants also took care to speak in coded language"); *United States v. Williams*, 737 F.2d 594, 605 (7th Cir. 1984) ("When the investigation is of a suspected large-scale conspiracy, and when the suspects speak in veiled terms, the government is justified in

intercepting conversations that eventually prove to be without the scope of the Title III authorization.").

### b. Parties' Arguments

Romero requests that the Court reconsider its earlier ruling denying his motion to suppress the phone calls intercepted during the wiretap. (Doc. 490 at 1). Romero acknowledges that the orders authorizing and re-authorizing the wiretap track statutory requirements concerning the minimization of calls. (Doc. 490-2 at 1). However, he argues that no "real minimization" took place during the wiretap. (*Id.* at 1). Romero maintains that the monitors testified that they listened "to every call from beginning to end, made notations and conferred with case agents to determine whether a particular call needed to be transcribed." (*Id.*). He also contends that, notwithstanding statements in the 15-Day Reports indicating that minimization occurred, the statistics appended to the 15-Day Reports show that only 0.15% of calls were minimized. (*Id.* at 2). In its instructions on conducting the wiretap, the Government instructed participants that listening to every call could result in the suppression of evidence; Romero asks that the Court "hold the Government accountable to their own instructions." (*Id.* at 3).

Romero also briefly addresses the "reasonableness" factors discussed *supra*, arguing first that the scope of the criminal enterprise is "limited," involving three alleged drug traffickers with a California source for their marijuana and which was successfully penetrated by two undercover agents. (*Id.*). Romero further maintains that the "character of the phone conversation are [sic] easily determinable," as participants frequently used "drug jargon," and that there was judicial supervision over the wiretap as demonstrated by the 15-Day Reports. (*Id.*). Romero also argues, however, that the reasonableness factors do not "come into play because minimization did not exist." (*Id.*).

The Government opposes. (Doc. 514). First, the Government argues that its instructions for conducting the wiretap were consistent with the authorities cited *supra*. (*Id.* at 5). The Government also observes that more calls may be intercepted during the "initial phase" of a wiretap or where targets speak in a foreign language or use jargon. (*Id.* at 5-6). The Government further maintains that "very short calls are not subject to minimization," and there was meaningful judicial supervision over the wiretap. (*Id.* at 6). Additionally, the Government believes that wholesale suppression of the wiretap is inappropriate in this case, and Romero has not identified particular calls, or a pattern of calls, that allegedly should have been minimized but were not. (*Id.* at 6-7).

### c. Analysis

In light of the arguments of the parties and the authorities discussed *supra*, suppression is unwarranted. Preliminarily, the exact significance of the monitors' testimony is unclear: Romero is correct that, taken at face value, their testimony suggests that absolutely no minimization occurred in this case. The 15-Day Reports suggest otherwise, however, and Romero does not assert, or present evidence to suggest, that the 15-Day Reports are inaccurate. Even if the difference between absolutely no minimization and the minimization described in the 15-Day Reports is not large in absolute terms, that difference suggests that the Government followed some minimization procedures and made some efforts to minimize. In other words, contrary to Romero's suggestion, some minimization occurred, and the Government's efforts must be tested for reasonableness.

The Government has made an initial showing of its objectively reasonable efforts to comply with the minimization requirements set forth in 18 U.S.C. section 2518(5), the procedures in this Court's orders, and its own instructions for conducting the wiretap. *Brown*,

303 F.3d at 604. While the percentage of minimized calls is low, the figures cited in the Motion include many very short calls, which some courts have ruled are not subject to minimization at all. *Dumes*, 313 F.3d at 380. More significantly, the Supreme Court has cautioned lower courts not to rely solely upon the percentage of nonpertinent calls intercepted, but rather to evaluate the overall reasonableness of the Government's conduct. *Scott*, 436 U.S. at 140.

Here, virtually all of the relevant factors support broad interception of calls. As the Fifth Circuit has opined, in the initial phases of executing a wiretap order, interception of all or nearly all calls may be warranted. *Brown*, 303 F.3d at 604; *see also Scott*, 436 U.S. at 141 ("During the early stages of surveillance the agents may be forced to intercept all calls to establish categories of nonpertinent calls which will not be intercepted thereafter."). The Government's instructions and conduct of the wiretap were consistent with this directive. (*See* Doc. 490-9 at 9 ("pattern of innocence" might arise "after several days or weeks of interception" and only for specific individuals under specific circumstances)). Additionally, the targets used "guarded," coded jargon in a foreign language, warranting extra "leeway." *Scott*, 436 U.S. at 140; *Gordon*, 871 F.3d at 48. The wiretap was directed at discovering the members and overall structure of a drug trafficking conspiracy; while Romero contends that the scope of the conspiracy was "limited," the Court declines to so characterize an alleged drug trafficking conspiracy with a supplier in California and connections to an international cartel. *Scott*, 436 U.S. at 140 ("[W]hen the investigation is focusing on what is thought to be a widespread conspiracy more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise. And it is possible that many more of the conversations will be permissibly interceptible because they will involve one or more of the co-conspirators."); *Brown*, 303 F.3d at 604-05 ("[T]he government may reasonably intercept more calls during the initial phase of an investigation,

when the precise scope of and participants in the criminal scheme have not yet been identified. This consideration is especially strong where the criminal enterprise under investigation is a large and sophisticated conspiracy, and the purpose of the intercept order is to learn the identities of conspirators and define the reach of the conspiracy."). Judicial supervision was frequent and was based on detailed 15-Day Reports supplied by the Government. *Brown*, 303 F.3d at 604. Indeed, a judge of this Court re-authorized the wiretap based on the information supplied by the Government. (*See generally* Doc. 490-4).

Moreover, Romero must identify specific statements that he contends should be suppressed, particularly given that the Government has made at least a prima facie case that it made reasonable efforts to minimize. *See United States v. Gaytan*, 74 F.3d 545, 554 (5th Cir. 1996) ("Even assuming the order to be overly broad and some of the interceptions to have been improper, the district court corrected the matter by excluding from evidence 'interceptions from the cellular telephones not involving at least one of these individuals named in the wiretap order as a party to the conversation.' The exclusionary rule does not require the exclusion of those conversations that were properly intercepted as well." (formatting altered)); *Cleveland*, 964 F.Supp. at 1091-92 ("Even if defendant Bankston were to question the applicability of *Gaytan*, suppression would still be wholly inappropriate in this case. Those courts that have allowed the remedy of complete suppression have done so only when there were violations of 'egregious magnitude,' which were in 'flagrant disregard' of the duties of minimization. Such cases generally involve instances where the government has made effectively no effort towards minimization whatsoever." (citation omitted)). Romero has failed to do so, nor has he rebutted the Government's showing in any other way. In such circumstances, suppression is unwarranted.

## IV. CONCLUSION

Accordingly, **IT IS ORDERED** that the Motion (Doc. 490) is **DENIED**.

Signed in Baton Rouge, Louisiana, on April 16, 2018.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**